# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Alisa R. Clemons,

Plaintiff,

Civ. No. 05-2165 (RHK/AJB)

**MEMORANDUM OPINION AND ORDER**

v.

The City of Minneapolis, *et al.*,

Defendants.

---

Donna L. Roback, Edina, Minnesota, for Plaintiff.

James A. Moore, Assistant City Attorney, Minneapolis, Minnesota, for Defendants City of Minneapolis, Minneapolis Police Department, Michael Becker, Thomas Ryan, Peter Ritschel, Shannon Barnette, and David Mattson.

Ann E. Walther, Karen E. Peterson, Rich, Michels & Walther, LLP, Minneapolis, Minnesota, for Defendant Robert Mooney.

---

# INTRODUCTION

In this action, Plaintiff Alisa Clemons has sued the City of Minneapolis (the "City"),

the Minneapolis Police Department (the "MPD"), several MPD officers, and Robert

Mooney, a Minneapolis park police officer, alleging various deprivations of her

constitutional rights by Defendants.  Defendants now move for summary judgment.[1]  For

---

[1] All of the Defendants but Mooney are represented by the same counsel.  Those Defendants have moved for summary judgment (Doc. No. 21), and Mooney has separately moved for summary judgment (Doc. No. 19); their arguments largely overlap.

the reasons set forth below, the Court will grant Defendants' Motions.

## BACKGROUND

The events giving rise to this action transpired on September 27, 2003.  On that day, Clemons, an African-American who is a former MPD officer, traveled with her brother Alfred Flowers and her two nieces to an NAACP meeting at the Urban League building in Minneapolis.  (Clemons Dep. Tr. at 22.)  When Clemons and Flowers signed in at the Urban League, Flowers told the receptionist that he was "going to cause all kinds of problems today."  (Moore Aff. Ex. 1B.)  Flowers was well known to Urban League staff; he had attended previous NAACP meetings and had "caused problems" by "taunting" members of the NAACP's executive committee.  (Id.)

While Clemons and her nieces went to the Urban League coffee shop, Flowers entered the NAACP's executive committee meeting, even though he was not a member of that committee.  (Clemons Dep. Tr. at 24; Moore Aff. Ex. 1B.)[2]  Because Flowers would not leave the meeting, the NAACP's President asked Torrence Abercrombie, the Urban League's facilities manager, to help him remove Flowers.  (Moore Aff. Ex. 1B.)  Abercrombie then entered the meeting room, where he found Flowers sitting on a table.  (Id.)  When Abercrombie asked Flowers to get off of the table, Flowers "snapped," yelling "don't come in here saying nothing to me, you ain't got nothing to say to me.  I'm a member of [the] NAACP, I can go anywhere I want."  (Id.)  Abercrombie then repeated his request

---

[2] There were two meetings scheduled that day – one of the NAACP executive committee and one for NAACP general members, the latter of which Clemons and Flowers had planned to attend.

that Flowers get off of the table, to which Flowers responded, "Don't call me nothing[.] You get out of here, you ain't got nothing to say to me, get out of here, you ain't got nothing to say to me." (<u>Id.</u>)  Abercrombie then left the executive committee meeting and dialed 911. (<u>Id.</u>)

Two MPD officers – Defendant Michael Becker and David Tschida – arrived a short time later; Abercrombie met them at the Urban League's front door to explain the situation. (<u>Id.</u>)  Abercrombie and the officers then approached Flowers and told him to leave the building and not return that day.  Flowers stated that he understood and exited the building, while Clemons remained inside in the lobby.  (Moore Aff. Ex. 1B; Clemons Dep. Tr. at 24.)

Flowers then walked down the street, talking on his cell phone, while Becker and Tschida watched him from their squad car across the street.  (Moore Aff. Ex. 1B; Clemons Dep. Tr. at 26-28.)  Eventually, the officers left the area and proceeded to another call. (Moore Aff. Ex. 1B.)  Around that time, Clemons exited the building and walked down the street to speak with Flowers; the two then returned to the Urban League with several other individuals.  (<u>Id.</u>; Clemons Dep. Tr. at 27.)[3]  Shortly after Flowers re-entered the building, Abercrombie again called 911, informing the operator that Flowers had returned and had become "violent."  (Moore Aff. Exs. 1A, 1B; Clemons Dep. Tr. at 29-30.)  Clemons

_____

[3] Flowers apparently had called the CEO of the Urban League, Clarence Hightower, to obtain permission to remain in the Urban League building.  He decided to return to the building with Clemons so that they could put Abercrombie on the phone with Hightower.  (Clemons Dep. Tr. at 29.) According to Abercrombie, Flowers and the other individuals with him were "running around" and "yelling and screaming" when Flowers re-entered the building.  (Moore Aff. Ex. 1B.)

observed Abercrombie dialing 911; she and Flowers then quickly exited the Urban League

building, but Flowers told Clemons to go back inside.  (Clemons Dep. Tr. at 30-31.)

As Clemons walked back toward the building's entrance, she saw a police car arrive;

the car was driven by Defendant Robert Mooney, a Minneapolis park police officer who

was responding to Abercrombie's second 911 call.  (Id. at 32, 35; Moore Aff. Ex. 1A.)[4]

Clemons entered the building and was inside for a brief period of time when she "got [a]

nagging feeling" and turned around to walk back outside.  (Id.)  As she exited the building,

Al McFarland, who was then entering, told Clemons something akin to "you better get down

there," meaning that she should get down to the area on the street where her brother was

standing.  (Id. at 33-34.)

Meanwhile, Mooney had approached Flowers to speak with him.  He asked Flowers

what was going on and Flowers responded that there was a fight inside the Urban League

building.  (Moore Aff. Ex. 1A.)  Flowers then proceeded to walk down the street away from

the building and away from Mooney.  (Id.)  Mooney followed Flowers and told him that

someone had called the police about an "unwanted" person in the Urban League building and

asked him if he knew what Mooney was talking about.  (Id.)  Flowers again advised Mooney

that there was a fight inside the Urban League building, which to Mooney was an "evasive"

answer that raised his suspicion.  (Id.)  Mooney then asked Flowers his name, but Flowers

---

[4] The Minneapolis Park and Recreation Board is a division of the City of Minneapolis, but is
governed by its own elected commissioners and has its own police department.  (Walther Aff. Ex. A.)
Minneapolis park police officers have the same jurisdictional authority as MPD officers and can
respond to calls anywhere in the City.  (Johnson Aff. ¶ 2.)

did not respond.  He asked Flowers for identification, but Flowers told him that he had

none.  (Id.)  Mooney then surmised that Flowers was, in fact, the unwanted individual from

the 911 call.  (Id.)

Flowers then turned around and walked past Mooney, toward the Urban League

building.  (Id.)  Mooney asked Flowers to stop and to walk toward him instead, but Flowers

refused.  (Id.)  Mooney then radioed dispatch and asked for a description of the individual

identified in the 911 call.  The information relayed back matched Flowers's description.

(Id.)[5]  Mooney then approached Flowers, placed his hand on Flowers's left arm, and asked

Flowers to move toward his squad car.  (Id.)  Flowers pushed Mooney's hand away; at that

point, Mooney believed that Flowers was going to fight him.  (Id.)  When Mooney told

Flowers to place his hands behind his back, Flowers pulled away and assumed a fighting

stance.  (Id.)

Around this time, Clemons, who had just walked out of the front entrance of the

Urban League building, observed Mooney and Flowers together on the street.  In a "really

loud" fashion, she screamed out "Man," which is how she refers to Flowers.  (Clemons

Dep. Tr. at 35.)  Flowers turned towards Clemons and, in that instant, Mooney grabbed

Flowers's jacket, swept Flowers's legs out from under him, and knocked him to the ground.

(Id. at 35-37; Moore Aff. Ex. 1A.)  Mooney then sat on top of Flowers's chest, waiting for

other officers to arrive, while Flowers "violently struggled" to free himself.  (Id.)

_____

[5] The information indicated that the "unwanted" individual was a tall, African-American male
wearing a yellow jacket.  (Moore Aff. Ex. 1A.)

Having seen her brother taken down by Mooney, Clemons started running down the street as quickly as she was able, screaming "stop, stop, stop, wait a minute, wait a minute." (Clemons Dep. Tr. at 38.)[6]  As she moved up the street, Becker and Tschida arrived to assist Mooney.  (Id. at 39.)  By the time Clemons reached the scene, Tschida was trying to handcuff Flowers and, according to Clemons, Becker was kicking Flowers while Mooney "walked up [Flowers's] back with his knee."  (Id. at 39-40.)  Clemons continued yelling "loudly" at the officers, eventually approaching to within an arm's length of them.  (Id. at 41-42, 90-91.)  Mooney then stood up, told Clemons to "get back," and pushed her in the chest with the heels of his hands.  (Id. at 41-43.)[7]  The push was hard enough to force Clemons backwards, but she retained her balance and did not fall over.  (Id. at 41-42.)  Undeterred, Clemons continued to yell at the officers, screaming "stop kicking him, he's handcuffed, you're stepping over the line, get a supervisor here."  (Id. at 44.)  According to Clemons, Becker then said "fuck you" and punched Clemons in her chest.  (Id.)  Once again, Clemons staggered backwards but retained her balance and did not fall over.  (Id. at 91.)

Clemons's yelling and the commotion surrounding Flowers's arrest drew the attention of several other individuals in the Urban League building, as well as a number of teenagers across the street.  They began yelling at the officers and a number of them converged on the scene.  (Clemons Dep. Tr. at 44-45.)  Meanwhile, Flowers continued to

---

[6] Clemons apparently wears a leg brace due to a disability.  (Clemons Dep. Tr. at 38.)

[7] Clemons stated that Mooney did not use closed fists; rather, his "fingers were tilted backwards and the palms or bottom of the heels were what he hit [Clemons] in the chest with." (Clemons Dep. Tr. at 42.)

struggle with the officers as they attempted to get him into Mooney's squad car through the

driver's side rear door.  (Id. at 44-45; Moore Aff. Ex. 1A.)  Mooney ran around the car to

pull Flowers inside from the passenger side while Becker tried to push Flowers in from the

driver's side.  (Clemons Dep. Tr. at 44-45.)  Because Flowers continued to resist the

officers' efforts, Becker placed his hand on Flowers's throat in a "pressure point

technique" to attempt to coerce him to get into the car.  (Clemons Dep. Tr. at 47-48;

Moore Aff. Ex. 1A.)

By this time, a large crowd had gathered around the officers, with several people

screaming that Becker was choking Flowers and that he couldn't breathe.  (Id. at 48; Moore

Aff. Ex. 1A.)  Someone from the crowd then reached out, grabbed Becker's hand, and pulled

it off of Flowers's throat – the officers claim that this person was Clemons, while Clemons

denies that it was her.  (Moore Aff. Ex. 1A; Clemons Dep. Tr. at 48.)  Despite Becker

having his hand pulled from Flowers's throat, the officers ultimately succeeded in getting

Flowers into the squad car.  (Id. at 48-49.)

At this point, Clemons had moved into the driver's doorway; the driver's door was

open.  According to Clemons, Becker then walked into the doorway and punched her in the

chest again.  Clemons fell backwards from this blow but did not fall down.  (Id. at 91-92.)

Mooney then ran around the car to the open driver's side door, "grabbed" Clemons by her

jacket and "pulled [her] out of the doorway."  (Id. at 49.)  According to Clemons, she "went

flying out of the driver's door area," but she caught her balance and did not fall over.  (Id.)

Mooney then left the area with Flowers in his squad car.  Clemons was not arrested or taken

into custody.

Mooney proceeded to drive Flowers to the MPD's fourth precinct station, where he met with several MPD officers, including Defendant Sergeant Shannon Barnette. (Mooney Dep. Tr. at 53-54.) Clemons and several other individuals later arrived at the fourth precinct to give statements concerning Flowers's arrest. (Clemons Dep. Tr. at 105.) Barnette, however, would only agree to accept a statement from one person, Natalie Johnson-Lee. (Id. at 58-59, 105.) Johnson-Lee is African-American and is a former member of the Minneapolis City Council. (Johnson-Lee Aff. ¶¶ 1, 8.) Although Barnette ultimately did not take a statement from Johnson-Lee on the date of the incident, Johnson-Lee spoke with Defendant Sergeant Thomas Mattson – one of several officers assigned to investigate the incident – a few days later. (Id. ¶ 8.)[8]

On September 30, 2003, Ritschel, Vereb, and Ryan executed a search warrant at the Urban League, seeking security videotapes of the September 27 incident. (Moore Aff. Ex. 1B.) Ritschel and Ryan waited in the lobby while Vereb retrieved the videotape.[9] As they sat in the lobby, Ritschel and Ryan were approached by Clemons, who had gone to the Urban League that morning to discuss the incident with Hightower. As she approached the officers, Clemons complained of chest pain; when Ryan asked her what was wrong, Clemons said that she had been pushed by an unknown police officer. (Moore Aff. Ex. 1B.)

---

[8] Also assigned to the investigation were Sergeant John Vereb, Defendant Sergeant Peter Ritschel, and Defendant Sergeant Thomas Ryan. (Moore Aff. Ex. 1B.)

[9] Although a videotape apparently exists, no party has submitted it to the Court.

8

According to Ritschel and Ryan, Clemons then explained what had transpired and, in doing so, acknowledged that she had grabbed Becker's hand from Flowers's throat and stated that she was sorry the police had to get involved.  (Id.)  She further stated that "numerous" people were confronting the officers during Flowers's arrest and that she understood why the officers were afraid, because "if the roles were reversed she would be afraid if a bunch of screaming white people surrounded her."  (Id.)  Clemons denies making these statements and claims that they were fabricated by Ritschel and Ryan.

Over the succeeding days, Mattson conducted several interviews, but he did not interview Clemons or Flowers.  After concluding his investigation, the matter was presented to Assistant City Attorney Laufele Murphy for review.  (Murphy Dep. Tr. at 7.) Based on the results of the investigation and the arresting officers' reports, Murphy decided that Clemons should be charged with obstruction of legal process; she was charged by criminal complaint on October 24, 2003.  (Id. at 35, 41, 43.)  Before her trial commenced, she moved to dismiss the charge for lack of probable cause, but that motion was denied by the Hennepin County District Court.  (Walther Aff. Ex. F.)  Clemons was acquitted of the charge after a jury trial in October 2004.

On September 19, 2005, Clemons commenced the instant action against the City, the MPD, Mooney, Becker, Ryan, Ritschel, Barnette, and Mattson.[10]  Clemons's Complaint

---

[10] Clemons also sued Kevin Stoll, an MPD Lieutenant, but she has since dismissed her claims against him.  In addition, she sued several "John Doe" defendants, but she has neither identified nor served those defendants.  Accordingly, they will also be dismissed.  See Brown v. City of Bloomington, 280 F. Supp. 2d 889, 891-92 (D. Minn. 2003).

contains nine counts, only five of which are relevant for present purposes:  (1) an

excessive-force claim against Mooney and Becker (Count I); (2) a substantive-due-process

claim against all Defendants, as a result of alleged fabrications during the investigation and

the failure to interview witnesses, culminating in Clemons's "malicious prosecution"

(Count II); (3) a conspiracy claim against all Defendants (Count III); (4) an equal-protection

claim under 42 U.S.C. § 1981 against Mooney, Becker, Ryan, Ritschel, and Barnette (Count

IV); and (5) a <u>Monell</u> claim against the City and the MPD (Count IX).[11]  Defendants now

assert that they are entitled to summary judgment on each of these claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477

U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  <u>Id.</u> at 322; <u>Mems v. City of St. Paul, Dep't of Fire & Safety

Servs.</u>, 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  <u>Graves v. Ark. Dep't of Fin. & Admin.</u>, 229 F.3d 721, 723 (8th Cir.

2000); <u>Calvit v. Minneapolis Pub. Schs.</u>, 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

---

[11] <u>See</u> <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S. 658 (1978).

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le

Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

### I.      Excessive force

In her first claim, Clemons alleges that Mooney and Becker each used excessive

force when they shoved and punched her during Flowers's arrest.  The officers assert that

they are entitled to qualified immunity on this claim.  The Court agrees.[12]

When analyzing whether a police officer is entitled to qualified immunity, a court

must conduct a two-part inquiry.  First, it must consider whether the facts alleged, when

viewed in the light most favorable to the party asserting injury, show that the officer's

conduct violated a constitutional right.  If a violation could be established based on those

facts, the court must then inquire whether the constitutional right at issue was clearly

established at the time the violation occurred.  E.g., Avalos v. City of Glenwood, 382 F.3d

792, 798 (8th Cir. 2004).

The constitutional right at issue here is the right to be free from the use of excessive

force.  It is beyond peradventure that the Fourth Amendment precludes the use of excessive

force by law-enforcement officers and that such right was clearly established on the date in

_____

[12] Although the heading of Clemons's excessive-force claim indicates that she has asserted that claim only against Mooney and Becker, she also alleges that "[o]ther Defendants" failed to prevent these two officers' use of excessive force.  (Compl. ¶ 42.)  Because the Court concludes that neither Mooney nor officer Becker used excessive force, this additional "claim" also fails.

question.  E.g., Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005).[13]  However, "not

every push or shove by an officer violates the Fourth Amendment."  Id.  Rather, the amount

of force used by a police officer is excessive only if it was "objectively [un]reasonable

under the particular circumstances."  Id.  In deciding whether an officer's actions were

objectively unreasonable, a court must allow for the fact that "officers are often forced to

make split-second judgments – in circumstances that are tense, uncertain, and rapidly

evolving – about the amount of force that is necessary."  Graham v. Connor, 490 U.S. 386,

397 (1989).

       Here, the Court has little trouble concluding that, when viewed in the light most

favorable to Clemons, the facts do not permit a reasonable jury to conclude that Mooney

used excessive force.  There is no dispute that, as Mooney struggled with Flowers,

Clemons raced up to him, approaching to within an arm's length, while screaming "loudly"

that he should stop what he was doing.  In the Court's view, it was reasonable for Mooney to

push Clemons out of the way under these circumstances, in order to prevent her from

(further) interfering with Flowers's arrest.  Moreover, the amount of force Mooney used

was slight; his fists were open and, although his shove knocked Clemons backwards, it did

not cause her to lose her balance or fall over.

       The same is true of Mooney's second physical encounter with Clemons, when he

---

       [13] Excessive-force claims typically are brought by arrestees, pre-trial detainees, or prisoners;
Clemons does not fit into any of these categories.  The Fourth Amendment nevertheless protects her
from the use of excessive force.  See Andrews, 417 F.3d at 818 (Fourth Amendment protected
criminal-proceeding bystander against use of excessive force).

12

grabbed her by the jacket and pulled her out of his squad car's doorway.  Clemons's mere

presence in the doorway impeded Mooney from entering his car and leaving a scene

growing more unruly by the moment.  It was appropriate in these circumstances to remove

Clemons from the doorway so that Mooney could exit the area.  Furthermore, the amount

of force Mooney used to remove Clemons from the doorway was almost non-existent; in

fact, it did not involve any direct contact between Mooney and Clemons's person, since he

only grabbed her jacket.

Although they present a closer call, the Court also believes that Becker's contacts

with Clemons do not rise to the level of constitutionally excessive force.  Becker

reasonably interpreted Clemons's actions – racing up to the officers and "loudly" yelling at

them while in close proximity – as hostile, and a riotous crowd was amassing nearby.  As

with Mooney, given this chaotic scene, it was not unreasonable for Becker to use some

measure of force to prevent Clemons from interfering with Flowers's arrest or from

potentially injuring the officers.

Moreover, the amount of force Becker used, while not slight, was not considerable.

Although he purportedly punched Clemons with a closed fist on two occasions, she admits

that the blows she sustained were not hard enough to knock her over, but rather were "just

enough to send [her] back."  (Clemons Dep. Tr. at 92.)  And, Clemons also admits that the

only injury she sustained as a result of the punches to her chest was some reddening of the

skin and soreness that abated in four or five days.  (Clemons Dep. Tr. at 85-86.)  "[A] *de*

*minimis* . . . injury is insufficient to support a finding of a constitutional violation."

13

Andrews, 417 F.3d at 818; accord Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th

Cir. 2005).  In Andrews, the defendant hit the plaintiff in the shoulder with a "forceful

blow" that was strong enough to make the plaintiff "see stars."  417 F.3d at 815.  As a

result, the plaintiff suffered from a sore neck, a "horrible, horrible headache," and a painful

flare-up of pre-existing back injuries.  Id.  The Eighth Circuit held that these injuries were

insufficient to establish an excessive-force claim.  The injuries Clemons sustained here

appear less severe than those at issue in Andrews and, accordingly, cannot support

Clemons's claim.[14]

Because the facts, when viewed in the light most favorable to Clemons, do not

establish the use of excessive force, Mooney and Becker are entitled to qualified immunity

on this claim.  Avalos, 382 F.3d at 798.

## II.    Substantive due process

In Count II, Clemons alleges that Defendants violated her substantive-due-process

rights.[15]  To establish such a violation, Clemons must show that Defendants' conduct

---

[14] In her Memoranda in Opposition, Clemons also suggests that she has suffered emotional injuries as a result of the officers' use of "excessive" force.  (See Mem. in Opp'n to City's Motion at 12-13.)  When asked to explain her "psychological damage" at her deposition, Clemons stated that she "cr[ies] all the time" and "can't stand to even talk about this incident" because it "makes [her] emotional," and that she becomes frightened whenever she sees a squad car behind her while driving. (Clemons Dep. Tr. at 87.)  Clemons has not clarified, however, whether this alleged emotional damage resulted from the use of "excessive" force or, rather, stems from Clemons's "malicious" prosecution.  Moreover, Clemons admits that she has not sought (or received) any treatment for her alleged emotional injuries.  (Id.)  Accordingly, the Court concludes that these emotional "injuries" also are insufficient to support Clemons's excessive-force claim.

[15] Although it is not entirely clear from her Complaint, Clemons also appears to allege in  Count II a Fourth Amendment violation due to her "unlawful arrest" without probable cause.  (Compl. ¶ 47.)

(1) was "conscience shocking" and (2) violated "one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Terrell v. Larson, 396 F.3d 975, 978 n.1 (8th Cir. 2005) (citation omitted).

Clemons's claim founders on the second prong of this test, because she bases her claim predominantly on Defendants' alleged violations of her Fourth Amendment right to be free from excessive force and her Fourteenth Amendment right to equal protection under the law. (See Mem. in Opp'n to City's Motion at 18-19.) The Supreme Court has counseled, however, that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994)). Accordingly, Clemons cannot base her substantive-due-process claim on these alleged constitutional violations by Defendants. See, e.g., Smithson v. Aldrich, 235 F.3d 1058, 1064 (8th Cir. 2000) (reversing denial of summary judgment to defendant on substantive-due-process claim predicated on alleged violations of Fourth Amendment).[16]

---

This claim fails for two reasons: first, Clemons was never arrested, and second, probable cause existed to charge Clemons with obstruction. (See infra at 17-18 & n.17.)

[16] In her Memoranda in Opposition to Defendants' Motions, Clemons for the first time purports to assert a First Amendment claim, and she bases her substantive-due-process claim in part on the alleged First Amendment violation. However, the First Amendment is nowhere mentioned in Clemons's Complaint. Accordingly, the Court declines to consider this claim; parties are "not entitle[d]

Perhaps recognizing this flaw in her case, Clemons also asserts that she has a "fundamental right in protecting her reputation" and that her reputation was damaged by being charged with obstructing legal process. (See Mem. in Opp'n to City's Motion at 20-21.) Assuming *arguendo* that the right to a good reputation is the type of right "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed," Terrell, 396 F.3d at 978 n.1, Clemons's claim still fails. Clemons asserts that her reputation has been damaged because "the public has ready access to arrest records" (Mem. in Opp'n to City's Motion at 20-21), but Clemons was never arrested; she was charged only by criminal complaint. Moreover, Clemons has not proffered any evidence indicating that records concerning her criminal prosecution have actually been accessed by the public. In fact, Clemons has proffered no evidence whatsoever supporting the purported "reputational harm" she has suffered.

-----

. . . to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004); accord Butvin v. DoubleClick, Inc., No. 99 Civ. 4727, 2000 WL 827673, at *13 (S.D.N.Y. June 26, 2000) ("A party is not entitled to amend his complaint through his memoranda.") (citing, *inter alia*, Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)).

At oral argument, Clemons requested leave to amend her Complaint to "conform to the evidence," asserting that her pleading deficiencies were due to her need for discovery. This argument rings hollow. Indeed, the discovery period closed in January 2007, but Clemons has not sought leave to amend her Complaint since that time – that is, until she requested such relief at oral argument on the instant Motions. Moreover, it does not appear that Clemons needed discovery in order to develop the factual predicate for her newly asserted claim. (See Mem. in Opp'n to City's Motion at 13-15 (noting that First Amendment "claim" was based on statements Clemons made to officers during Flowers's arrest).) Accordingly, the Court denies Clemons's belated request to amend her Complaint.

More fundamentally, in the Court's view, no substantive-due-process claim may lie when the claim is based on reputational harm flowing from a criminal prosecution if the crime charged was supported by probable cause; to conclude otherwise would permit every defendant charged with a crime, even those ultimately adjudicated guilty, to assert a claim for reputational injury under the rubric of substantive due process. Here, the state District Court concluded that there was a "substantial" showing of probable cause to support the charge brought against Clemons; the Court perceives no basis to disturb that conclusion. (Walther Aff. Ex. F.)[17]

Clemons also asserts that her substantive-due-process rights were violated because Defendants' conduct created a "danger" that she would be forced to serve jail time, in which she might have been "incarcerated with people she had previously arrested and charged." (Mem. in Opp'n to City's Motion at 21-22.)  To succeed on a state-created-danger claim, however, a plaintiff must show that the defendant's conduct put the plaintiff at a "significant risk of serious, immediate, and proximate harm."   Avalos, 382 F.3d at 798.  Assuming that Clemons had been convicted as a result of Defendants' alleged "misconduct," she has proffered no evidence indicating that she could not have been adequately protected during

---

[17] Notably, in asking that the criminal charge against her be dismissed, Clemons asserted that Defendants had fabricated evidence and engaged in an incomplete and biased investigation, allegations that she repeats here.  The state court rejected those allegations.  (See Walther Aff. Ex. F at 5, 10-11 (noting that there was nothing "inherently incredible" in the officers' testimony and that the testimony was not "fatally impeached" by other evidence; that there existed "no persuasive evidence [that Defendants had engaged in] falsification or concealment of evidence"; and that he perceived no "deliberate action or inaction of a magnitude that would require or justify" dismissing the criminal charge).)

17

any subsequent incarceration.  Hence, she cannot show that there existed any significant

risk of harm flowing from Defendants' conduct.

For these reasons, Clemons's substantive-due-process claim fails.

## III.    Equal protection

In Count IV, Clemons asserts that the decision to prosecute her for obstruction was

based on her race and, therefore, she was denied equal protection of the law, pursuant to 42

U.S.C. § 1981.[18]  (See Mem. in Opp'n to City's Motion at 15-18.)  Specifically, Clemons

asserts that "*the officers's* decision to prosecute" her was discriminatory.  (Mem. in Opp'n

to City's Motion at 18 (emphasis added).)  Yet, Murphy testified that it was he – and he

alone – who made the decision to charge Clemons with obstruction (Murphy Dep. Tr. at 35-

36), and Clemons has proffered no evidence to contradict that assertion.  Because Murphy

has not been named as a Defendant, this claim fails *ab initio*.

In any event, in order to survive summary judgment on this claim, Clemons must

proffer evidence from which a reasonable jury could conclude that Defendants' actions

were taken on account of Clemons's race.  E.g., Johnson v. Crooks, 326 F.3d 995, 1000

(8th Cir. 2003) (requiring proof of "discriminatory purpose" to substantiate equal-

protection claim).  To do so, Clemons points to the fact that she twice sued the MPD for

---

[18] Although she argues in her Memoranda in Opposition that Count IV is an equal-protection
claim, Clemons's Complaint frames this claim in terms of race discrimination rather than equal
protection.  This is a distinction without a difference, however, because discrimination claims under
Section 1981 are construed in the same manner as equal-protection claims.  See Gen. Bldg.
Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 389-90 (1982).

race discrimination when she was an MPD officer; both cases were settled.  In addition,

Clemons notes that her MPD employment was terminated after she was accused of sending

"racist hate mail" to other African-American MPD officers – she grieved her termination

through her union and was reinstated.  Clemons argues that various MPD officers continue

to harbor "ill feelings" against her as a result of her prior lawsuits and the "hate mail"

allegation.  She relies on those "ill feelings" to support her assertion of racial animus on

the part of Defendants.  (See Mem. in Opp'n to City's Motion at 17.)

But Clemons's generalized allegation that unidentified persons at the MPD harbor

"ill feelings" toward her does not establish that *the individual Defendants named here* had

similar "ill feelings" (or were even aware of the prior incidents giving rise thereto).  More

importantly, Clemons has failed to show that any such animosity (assuming it existed) was

*caused by her race* – indeed, such animosity among the individual Defendants could just

have easily arisen from the fact of the lawsuits themselves, *i.e.*, displeasure that 'one of

their own' had opted to sue the department.

At her deposition, Clemons was repeatedly asked to explain her belief that

Defendants' actions were motivated by her race.  In each instance, she could provide no

particulars beyond her own subjective "feelings."  For example, when asked why she

believed Mooney had acted with racial animus, Clemons stated:  "I don't know, just working

with the – working within that organization, I know how they feel."  (Clemons Dep. Tr. at

73.)  When asked why she believed Becker had acted with racial animus, Clemons stated:

"That hate mail, they all hated me.  They all believed those lies.  They made my life

miserable." (Id. at 93.)  When pressed for specifics, the best she could muster was, "I can't answer it any other way but race and me go together with the police department."  (Id. at 102; see also id. at 94 ("It was all about race.  Always been about race."); id. at 98 ("They all had problems with me, and it was nothing but race."); id. at 100 ("I think it was about race and race is me.").)  Without any *evidence* – rather than speculation – to show that Defendants' so-called "ill feelings" were based on Clemons's race, her claim fails.  See, e.g., Crooks, 326 F.3d at 1000 (reversing denial of summary judgment on equal-protection claim where plaintiff presented only her "personal opinion that she was stopped on account of her race, plus additional aspects of [her] encounter [with police] that do not directly evidence racial animus").[19]

In her Memoranda in Opposition to Defendants' Motions, Clemons also argues – for the first time – that she comprises a "class of one" and that she was singled out by Defendants for differential treatment not due to her race, but rather because she had

_____

[19] In her Answers to Mooney's Interrogatories, Clemons also asserted that Defendants' racial aminus is evidenced by the fact that (1) the majority of un-interviewed witnesses were African American and (2) there is a documented history of "racial tension" between the MPD and the African-American community.  (See Mooney's Mem. at 18.)  It is not a surprise, however, that the majority of witnesses to the incidents on that fateful day – including those not interviewed – were African American.  Indeed, the incident occurred outside of a meeting of the NAACP, an African-American organization.  And, there is no dispute that several African-Americans, including Abercrombie and Johnson-Lee, were interviewed as part of the investigation.  These facts do not permit the inference that race played a role in the decision not to interview certain individuals.

Additionally, "racial tension" – a term that Clemons does not define – is not the same as "racial animus."  Clemons points to several studies indicating that African Americans are disproportionally the target of arrest and prosecution in Minneapolis, yet she offers no information about the qualifications of the individuals who prepared those studies, rendering their admissibility suspect.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

previously sued the City and the MPD.  (See Mem. in Opp'n to City's Motion at 15-16

(arguing that "there exists a genuine issue of material fact regarding whether the officers

intentionally treated Clemons differently *because she had previously sued the City and

the MPD*") (emphasis added).)  In her Complaint, however, Clemons alleged only that

Defendants' actions occurred "as a direct result of [her] race" and that those actions were

"racially motivated and discriminatory."  (Compl. ¶¶ 59-60.)  The Court concludes that

these allegations were insufficient to place Defendants on notice of Clemons's "class of

one" claim; accordingly, the Court will not consider that claim.  (See supra note 16.)

Nevertheless, the Court notes that Clemons has failed to identify any other individuals who

have sued the City and who were treated differently from her.  See Village of Willowbrook

v. Olech, 528 U.S. 562, 564 (2000) ("class of one" plaintiff must show that she was treated

differently than other similarly situated persons).

      For all these reasons, Clemons's claim under 42 U.S.C. § 1981 fails.

**IV.**    **Conspiracy and Monell**

      In Count III, Clemons alleges that the Defendants conspired to violate her civil

rights, and in Count IX Clemons alleges that her civil rights were violated as a result of the

City's deliberate indifference and its inadequate policies and procedures (a Monell claim).

Because Clemons cannot prove an underlying constitutional violation, these claims

necessarily fail.  See, e.g., Williams v. City of Carl Junction, 480 F.3d 871 (8th Cir. 2007)

(affirming dismissal of Monell claim where plaintiff had "failed to prove a deprivation of

his constitutional rights"); Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999) (absent

deprivation of constitutional right or privilege, no conspiracy claim may lie); Hassan v. City

of Minneapolis, Civ. No. 04-3974, 2006 WL 2583182, at *8 (D. Minn. Sept. 1, 2006)

(Frank, J.) (dismissing Monell and conspiracy claims where plaintiff failed to prove

deprivation of constitutional right).

## V.    Supplemental jurisdiction

Having concluded that summary judgment must be granted in Defendants' favor on

Clemons's federal claims, the Court's original jurisdiction has been extinguished.  Pursuant

to 28 U.S.C. § 1367(c)(3), the Court may, *sua sponte*, decline to exercise supplemental

jurisdiction over pendent state-law claims if it has dismissed all claims over which it has

original jurisdiction.  Johnson v. City of Shorewood, 360 F.3d 810, 819 (8th Cir. 2004).

And, when all federal claims are eliminated before trial, the balance of factors to be

considered in deciding whether to exercise supplemental jurisdiction over pendent state-

law claims typically militates against exercising jurisdiction.  Id. (citing Carnegie-Mellon

Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).  Based on Section 1367(c)(3) and Johnson,

the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims

for false arrest (Count V), malicious prosecution (Count VI), assault and battery (Count

VII), and defamation (Count VIII).[20]

---

[20] By failing to respond to Defendants' arguments concerning her defamation claim, Clemons
has abandoned that claim.  The Court will not dismiss that claim, however, insofar as it has opted not to
exercise supplemental jurisdiction over Clemons's state-law claims.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED** that Defendants' Motions for Summary Judgment (Doc. Nos. 19 and 21) are

**GRANTED**.  Clemons's federal claims (Counts I, II, III, IV, and IX) are **DISMISSED**

**WITH PREJUDICE** and Clemons's state-law claims (Counts V, VI, VII, and VIII) are

**DISMISSED WITHOUT PREJUDICE.**[21]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: April 23, 2007                                    s/Richard H. Kyle
                                                         RICHARD H. KYLE
                                                         United States District Judge

---

[21] See generally 28 U.S.C. § 1367(d).